IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| BRITTNEY MAY SIMMS,<br>    Plaintiff,<br><br>v.<br><br>DEGGELLER ATTRACTIONS, INC.,<br>    Defendant/Third-Party Plaintiff,<br><br>v.<br><br>GEORGE R. ROSEBERRY,<br>    Third-Party Defendant. | Case Nos. 7:12-cv-00038<br>             7:12-cv-00039<br>             7:12-cv-00161<br><br>**MEMORANDUM OPINION**<br><br>By:  James C. Turk<br>       Senior United States District Judge |
| GEORGE P. ROSENBERRY,<br>    Plaintiff/Counter-Defendant,<br><br>v.<br><br>DEGGELLER ATTRACTIONS, INC.,<br>    Defendant/Counter-Plaintiff. | |
| SAMATHA GOAD, a minor, by Jennifer<br>    Goad, her mother and next friend,<br>    Plaintiff,<br><br>v.<br><br>DEGGELLER ATTRACTIONS, INC.,<br>    Defendant/Third-Party Plaintiff,<br><br>v.<br><br>GEORGE R. ROSEBERRY,<br>    Third-Party Defendant. | |

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JAN 0 2 2013

JULIA C. DUDLEY, CLERK
BY: /s/
    DEPUTY CLERK

Each of these three related actions has three pending motions, all of which are briefed and were argued at a hearing held in chambers on December 19, 2012. Because the cases are related

and because the motions in each case are virtually identical, the Court discusses them together herein. The three motions in each case are: (1) Plaintiff/Counter-Defendant/Third-Party Defendant George Roseberry's motion for summary judgment on Deggeller's counterclaim and third-party claims, ECF Nos. 38, 40, 30;[1] (2) Roseberry's motion to dismiss the counterclaim and third-party claims based on spoliation of the evidence, ECF Nos. 40, 42, 32; and (3) Defendant Deggeller Attractions, Inc.'s ("Deggeller") motion to disqualify Plaintiffs' counsel based on an alleged conflict of interest, ECF Nos. 34, 36, 26. For the reasons set forth below, all of these motions are **DENIED**.

The Court will begin with a basic overview of the facts of the case, and will address additional facts as necessary in the context of analyzing each pending motion.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Deggeller entered into a contract with the City of Salem, Virginia to operate and conduct a "carnival midway" consisting of rides, games, shows, and concessions at the Salem Fair and Exposition, which was held at the Salem Civic Center in June and July 2011 ("the Fair"). One of the rides Deggeller operated at the Fair was the Riptide roller coaster. On or about July 3, 2011, all three Plaintiffs were riding the Riptide when their car travelled to the top of the roller coaster and came to a sudden stop. According to the Complaint and affidavits before the Court, Plaintiffs and others attempted to alert the employee operating the ride that their car had stopped, and that a second car on the tracks was likely to collide with the back of Plaintiffs' car. The operator did

---

[1] When referring to docket entries in this Opinion (at least as to documents that are nearly identical and have been filed in all three cases), the Court will cite to the corresponding docket number in each case in the numerical order of the cases. For example, "ECF Nos. 38, 40, 30" refers to ECF No. 38 in Case No. 7:12-cv-38, ECF No. 40 in Case No. 7:12-cv-39, and ECF No. 30 in Case No. 7:12-cv-161.

not take any action, [2] however, and the second car hit the back of Plaintiffs' car, injuring Plaintiffs. ECF Nos. 1 (Ex. A to Notice of Removal), 1 (Ex. A to Notice of Removal), 1, Compl. ¶¶ 4–5.

Plaintiffs Simms and Roseberry filed suit in the Circuit Court for the City of Salem, Virginia, and Deggeller removed those cases to this Court. The third Plaintiff, Goad, subsequently filed her suit directly in this court. This Court previously dismissed the breach of contract claim filed by Plaintiffs Simms and Roseberry, leaving each suit asserting only a negligence claim against Deggeller.

Deggeller has filed a counterclaim against Roseberry in his lawsuit, and third-party claims against Roseberry in the other two lawsuits. In those pleadings, Deggeller claims that Roseberry, prior to the ride beginning, was asked to remove the baseball cap he was wearing, and that he did so for a short time, but put the hat back on his head after the car left the starting point for the ride. According to Deggeller, Roseberry's hat came off during the ride and became wedged in the braking mechanism of the car he was riding. Deggeller further contends that it was Roseberry's hat that caused Plaintiffs' car to stop. The deposition testimony of one of the ride operators supports these facts, and Deggeller has also filed several photographs as exhibits, including one that purports to show Roseberry on the ride wearing his hat, and a second of what purports to be Roseberry's cap, although it is tattered near the visor part of the cap, is dirty or stained, and appears to have blue paint on it that resembles the blue painted tracks of the Riptide.

In their responses to the Counterclaim and Third-Party Claims and in conjunction with these motions, all three Plaintiffs have filed affidavits with the Court concerning what occurred

---

[2] At least one of the ride operators has testified that he did not know anything was amiss until the collision

with regard to the hat and the ride. In their affidavits, Simms and Roseberry testify that Roseberry had ridden the Riptide several times before and worn his hat, that no one ever asked Roseberry to remove his hat, either on the ride that resulted in the accident or on prior rides, and that other riders wore hats on the ride that night. Both of them also testified that before the impact, they saw Roseberry's hat lying on the ground, "not near the tracks or the braking system." From this, they contend that the "sole cause of the collision, and [their] injuries, was the failure of the operator to stop the second car from crashing into our car." ECF Nos. 38-1 40-1, 30-1, Roseberry Aff. ¶¶ 2-3, 8-9, Simms Aff. ¶¶ 2-3, 8-9. This is not entirely consistent with their purported statements to investigators immediately following the crash, when police spoke with them. At that time, according to the police report, both apparently advised police that Roseberry's hat came off his head as a result of the impact (in other words, after the collision had occurred). See ECF Nos. 42, 44, 38, Ex. E, Report of Detective M.D. Crawley, at 3.

Plaintiff Samantha Goad (who was a minor at the time of the accident and when her Complaint was filed, but is now eighteen years old), has filed an affidavit with testimony similar to the other Plaintiffs' affidavits. Goad was sitting in the same car as Roseberry and Sims, directly behind them. Like Roseberry and Simms, she testified that she never heard anyone tell Roseberry or anyone else to take a hat off. She stated that after the ride had begun, "it went down a hill when Roseberry's hat flew off his head between [her friend, who was riding with her] and me. I clearly saw it on the ground below where it landed. It was not on the tracks or near any breaking [sic] system." ECF Nos. 39, 41, 31, Goad Aff. ¶¶ 4-5. She further avers: "I can attest with certainty that Roseberry's hat had nothing to do with our car stopping or with the collision. The failure of the operators to stop the second car from crashing into our car—after we hollered at them to do so—is the cause of the crash and our injuries." Id.

Plaintiffs have also submitted an affidavit from Amanda J. Biggs, the ex-wife of Roseberry's son and mother to Roseberry's grandson, who had just gotten off the Riptide but was watching, and an affidavit from Daniel Pryor, who was in the Riptide car that collided with Plaintiffs' car. Biggs testified that she heard lots of screaming from both people on the coaster and people on the ground near the operator prior to the collision. ECF Nos. 38-1, 40-1, 30-1, Biggs Aff. at ¶ 3. She further testified that she did not hear anyone tell Riptide riders to take off their hats, and that she saw "a lot of riders wearing hats on the roller coaster that evening." Similarly, Mr. Pryor testified that he rode the Riptide coaster about three times that evening and that he wore his baseball hat each time. He further testified that "[a]t no time did any one tell me or any other rider to my knowledge to take off a hat." ECF Nos. 39, 41, 31, Pryor Aff. at ¶¶ 2-3. On the ride when the collision occurred, Pryor avers that "I was wearing my baseball cap as I had in each of my other rides and other riders also wore hats." Id. at ¶ 3.

## II. ANALYSIS

### A. Roseberry's Motions for Summary Judgment

Roseberry has filed a motion for summary judgment in each of the three cases arguing that judgment as a matter of law should be entered in his favor as to the counterclaim (in Roseberry's case) and the third-party claims (in Simms's and Goad's cases). In particular, he claims that the "undisputed facts" show that the riders alerted the ride operator that the first car was stopped and that the proximate cause of the collision was the operator's failure to stop the second car. In support of his motion, Roseberry relies on his affidavit and the affidavits of the other Plaintiffs, the affidavits of Biggs and Pryor, and the absence of any testimony from Deggeller employees who actually saw the collision. Based on the affidavits, in particular, he argues it is undisputed that the hat had nothing to do with stopping the first car.

Furthermore, Roseberry contends that, even assuming *arguendo* that his hat somehow caused the first car to stop, the proximate cause of the accident was the operator's negligent failure to stop the second car. He relies, in part, on the testimony of Francisco Gonzales, the ride operator, who testified that stopping a car on the Riptide would be "easy."[3] Gonzales Dep. at 23, attached to ECF Nos. 38, 40, 30.

Deggeller responds first by arguing that summary judgment would be premature, pointing out that most of the witnesses have not even been deposed yet. Second, it argues that there are disputes of fact that make the question of causation one for the jury. For support, it points to the deposition testimony of Francisco Gonzales. Gonzales testified that he told Roseberry to remove his hat prior to the ride and that Roseberry initially complied. ECF Nos. 42, 44, 38, Ex. A, Gonzales Dep. at 41-42. Gonzales also testified that he saw the hat again after the collision, when it was located "between the wheel [of the coaster car] and the track." Id. at 43. He testified that he and other employees had to push the car back and forth on the track to get it unstuck and that the car "became unstuck . . . once the hat fell down." Id. at 44-45. As noted, Deggeller also has included in its opposition a photograph of what is purportedly the Plaintiffs on the ride when they were injured (prior to the collision) and a photograph purportedly showing Roseberry's hat after the collision. In the former, Roseberry is wearing his hat. In the latter photo, it appears to be the same hat, but it is tattered and torn on the bill, and there are blue marks that appear to be the

---

[3] Deggeller characterizes Plaintiffs' argument as invoking the "last clear chance doctrine." See, e.g., ECF Nos. 42, 44, 38, at 3-4. This theory applies if the plaintiff "was negligently in a situation of peril from which he was physically unable to remove himself" and renders the defendant liable if he "saw, or should have seen, [the plaintiff] in time to avoid the injury by using reasonable care." Smith v. Spradlin, 132 S.E.2d 455, 457 (Va. 1963). At oral argument, Plaintiffs' counsel repeatedly argued that the doctrine would not apply here because Roseberry was not at all negligent, and the doctrine applies only when a second party negligently fails to avert damages caused by a first person's negligence. Regardless of the characterization of Roseberry's causation argument, the Court finds there are disputed material facts precluding the entry of summary judgment for Roseberry.

same color as the Riptide tracks across its front. It also appears to have black stains or marks on it. This is consistent with the deposition of Gonzales, who described the hat afterward as being "damaged," "scratched, [and] scraped." Finally, Deggeller points to Gonzales's testimony that he did not know that any car had gotten stuck on the track until after he heard the impact of the collision. Id. at 43. Based on these facts, Deggeller contends that summary judgment for Roseberry on the counterclaim and third-party claims would be inappropriate.

The standards for evaluating a summary judgment motion are well established. "Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, 'no material facts are disputed and the moving party is entitled to judgment as a matter of law.'" Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting Ausherman v. Bank of Am. Corp., 352 F.3d 896, 899 (4th Cir. 2003)); Fed. R. Civ. P. 56(a). Put differently, summary judgment should be entered if the Court finds, after a review of the record as a whole, that no reasonable jury could return a verdict for the non-moving party. See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958-59 (4th Cir. 1996).

Having reviewed the filings of the parties, the Court concludes that Roseberry has not shown he is entitled to summary judgment on the issue of causation in this case. Construing the facts in the light most favorable to Deggeller, the non-moving party, the Court cannot say that no reasonable jury could find in favor of Deggeller on its third-party claim or counterclaim. Based on the affidavits of Plaintiffs and others, as contrasted with Gonzales's testimony, there are clear disputes of material fact concerning: (1) whether Roseberry was told to remove his hat; (2) whether the hat caused the first car to stop on the tracks; (3) whether the ride operator knew or should have known there was a problem with the first car and that it was stopped before the

collision, and, if so; (4) whether the ride operator had sufficient time to stop the second car before the collision occurred. It is simply not possible to resolve these disputes of fact without judging the credibility of the witnesses. Accordingly, the motions for summary judgment, ECF Nos. 38, 40, 30, are DENIED.[4]

### B. Roseberry's Motions to Dismiss the Counterclaim and Third-Party Claims Based on Spoliation of the Evidence

Roseberry also seeks dismissal of the counterclaim and third-party claims against him on the grounds that Deggeller failed to maintain photos of other Riptide riders on the evening the accident occurred and failed to provide them to police as requested or during discovery to Plaintiffs. He points, in particular, to an affidavit from Detective Sergeant M.D. Crawley of the Salem Police Department. In his affidavit, Detective Crawley states that during the course of his investigation of the accident, he met with Deggeller's Manager, Scott Henry McNeill,[5] on July 3 and 5, 2011, and that McNeill produced two photos purportedly of Roseberry riding on the Riptide the evening of the accident, July 3. Crawley states that on July 5, 2011, when he returned to speak with McNeill:

> I observed other images of male riders of the coaster showing some of the males also wearing hats during the ride. I requested those images from [McNeill] as well, but I have never received them.

ECF Nos. 40, 42, 32, Crawley Aff. at 2.

Additionally, in their discovery requests, Plaintiffs requested all pictures of patrons riding the Riptide from 9 p.m. to 11 p.m. on July 3, 2011 in defendant's "photo system." In response,

---

[4] Roseberry also alleges that a possible defamation action by him might be "warranted," see 7:12cv39, ECF No. 40, at 5, which Defendant disputes. No defamation claim has been asserted in this case, so the Court does not address the parties' contentions regarding possible defamation.

[5] There are various spellings of "McNeill" in the filings and attached exhibits. The Court uses this one, which seems to be prevalent.

Deggeller stated that it "is not in possession of any additional photographs taken on July 3, 2011, beyond those already produced. Defendant preserved the photographs of Roseberry taken on the Riptide on July 3, 2011, and these have been produced. By default, the photo system writes over images taken, unless photographs are purchased." ECF Nos. 40, 42, 32, Resp. to Supp. Req. for Prod. of Docs. at 2. Roseberry argues that Deggeller's destruction of the photographs, which he describes as spoliation of evidence, should result in a sanction of the dismissal of the third-party claims and counterclaim, as well as the dismissal of any defense that Roseberry's errant hat caused the accident.

In response to the motion, Deggeller posits that it did not destroy the images taken July 3, 2011 of other riders (which were the documents requested in discovery). Instead, Deggeller alleges that the Riptide has an "integrated photography system that captures pictures of the riders during the ride" and that the photographs "are temporarily stored electronically and displayed for riders to view after they have completed the ride." If an image is not purchased, "the old photographs are deleted automatically as the new photographs are taken." ECF Nos. 43, 45, 35 at 1.

Deggeller also points out that the police asked for additional photos on July 5, 2011, not July 3, 2011. It apparently interprets Detective Crawley's affidavit as saying that the photos he saw on that date were also taken on July 5, 2011, not on the date of the accident as Plaintiffs requested in their discovery. Deggeller thus appears to argue that by July 5, 2011, two days after the accident, when the police requested photographs, the photo-taking machine had already

overwritten the July 3, 2011 photos.[6] Employees had apparently preserved the photographs of Roseberry taken on the Riptide on July 3, 2011, which were produced to Plaintiff.

Neither Roseberry nor Deggeller has provided any affidavit or other specific explanation as to how long photos are stored in the "photo system" before being overwritten, nor is there any specific evidence before the Court as to when the July 3, 2011 pictures were overwritten. Particularly in light of this missing information, the Court declines to order the dismissal of the counterclaims and third-party claims on the grounds of spoliation. The award of judgment as a sanction for spoliation of evidence is a "drastic" remedy that may only be imposed upon a showing of either bad faith or willful conduct. Hartford Ins. Co. of Midwest v. Am. Automatic Sprinkler Sys. Inc., 201 F.3d 538, 544 (4th Cir. 2000); Silvestri v. Gen. Motors Corp., 271 F.3d 583, 593 (4th Cir. 2001) (dismissal on the grounds of spoliation is "the ultimate sanction" and is "justified only in circumstances of bad faith" or when the prejudice denies the sanctioned party "the ability to adequately defend its case"). The Fourth Circuit has clarified that "bad faith" is not "an essential element of the spoliation rule." Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 156 (4th Cir. 1995); Buckley v. Mukasey, 538 F.3d 306, 323 (4th Cir. 2008) (quoting same). But willful conduct is. That is, to allow even the sanction of instructing a jury it may draw an adverse inference against a party who destroys evidence, the destruction cannot merely be negligent; rather, "the inference requires a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction." Vodusek, 71 F.3d at 156 (citations omitted); id. (a movant seeking a sanction for spoliation must show "intentional conduct" or "willful conduct" that resulted in the destruction of the evidence).

---

[6] Of course, Deggeller's interpretation might explain why it could not produce the July 3, 2011 photos to Plaintiffs, but does not explain why it could not have saved and given to police July 5, 2011 photos, if those are what police had requested.

Here, Roseberry has not shown evidence of willful conduct on the part of Deggeller, as required in Vodusek. While the fact that a collision occurred may have alerted Deggeller to the possibility that a lawsuit for injuries might be filed at some point, the Court is not convinced, absent evidence of knowledge or wrongdoing, that employees of Deggeller knew—on July 3, 2011—that photographs of other riders wearing hats would be material to a lawsuit that had not yet been filed.[7] Even if it did, as noted, no evidence has been offered to show how long the photographs were kept or maintained, and at what point the system automatically overwrote them.[8] At the very least, therefore, there is insufficient evidence on the record before the Court to conclude that Deggeller engaged in "intentional conduct" in destroying the photographs or that it acted in "bad faith."

Nor is the prejudice to Roseberry so severe that he is unable to adequately prosecute or defend his case. Cf. Silvestri, 271 F.3d at 593. The photographs might well have been the "best evidence" Roseberry could offer the jury to support his claim that lots of riders wore hats on the Riptide that night. But he nonetheless has his own affidavit, the Plaintiffs' affidavits, and affidavits from at least two other eyewitnesses stating that they saw people other than Roseberry wearing hats on the Riptide that night, or, in the case of Mr. Pryor, that he wore a hat on the Riptide that night.

---

[7] The Court does not rely on the mere fact that a lawsuit had not yet been filed, since that fact is not dispositive. See, e.g., Buckley, 538 F.3d at 323 ("The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation.") (quoting Silvestri, 271 F.3d at 591). Even if Deggeller reasonably should have known that photos of Roseberry with or without the hat may be relevant to anticipated litigation, the Court is not entirely convinced that Deggeller reasonably should have known that photographs of *other riders* with hats would be relevant.

[8] For example, no one has presented any evidence as to whether photos from the evening of July 3, 2011 were automatically overwritten on that date, the following day, or at some point after July 5, 2011, when the police requested them.

Accordingly, the Court declines at this time to dismiss the third-party claims and counterclaim against Roseberry as a sanction for alleged spoliation. In the event that Plaintiffs discover new or additional evidence of willful conduct on the part of Deggeller, they may present it to the Court.[9]

### C. Defendant's Motion to Disqualify Plaintiffs' Counsel

In the final set of pending motions, Defendant has moved to disqualify Plaintiffs' counsel on the grounds that he labors under an unwaivable conflict of interest. Specifically, Deggeller contends that the interests of Plaintiffs Goad and Simms, on the one hand, and Plaintiff/Third-Party Defendant Roseberry, on the other, are adverse. They thus request that counsel be removed from representing all three Plaintiffs.

Plaintiffs oppose disqualification. They argue that there is no actual conflict in this case because all of the Plaintiffs take the same factual position (as made clear in their affidavits) that neither Roseberry nor his hat played any role in the accident whatsoever and that the sole and proximate cause of the accident was the negligence of Deggeller's ride operator. Moreover, any potential conflict of interest has been fully disclosed to the clients and all have waived that conflict in writing.

In their opposition to disqualification, Plaintiffs rely heavily on several Legal Ethics Opinions ("LEOs"), authored by the Virginia State Bar Standing Committee on Legal Ethics, in order to support their argument that the type of multiple representation that exists in this case is

---

[9] Likewise, the Court does not address at this time whether a jury instruction might be warranted allowing the jury to draw an adverse inference against Deggeller as a result of the missing photographs. See, e.g., Buckley, 538 F.3d at 322-23. Again, if further evidence concerning the deletion of the photos shows that there was intentional destruction of such photos or otherwise supports a jury instruction that the jury may draw an adverse inference against Defendant based on its failure to maintain those photos, then the Court will address a request for such an instruction at the appropriate time before or during trial.

permissible. Defendant counters that the LEOs cited by Plaintiffs are inapposite either because they do not involve concurrent representation or they do not involve adverse plaintiffs. Deggeller contends that "Plaintiff presents no authority to authorize the conflict in which plaintiff's counsel is entwined." ECF Nos. 41, 43, 33, at 1.

The LEOs are not binding on this Court, but are "worthy of consideration and [are] entitled to such weight, if any, [the Court] desire[s] to accord [them]." United States v. Nicholson, 475 F.3d 241, 250 n.10 (4th Cir. 2007) (citing Commonwealth Coatings Corp. v. Cont'l Cas. Co., 393 U.S. 145, 149-50 (1968) as "recognizing that Rules of American Arbitration Association and Canons of Judicial Ethics are not binding authority, but that they are 'highly significant'"). In Nicholson, for example, the Fourth Circuit deemed an LEO "to be of some significance, but not . . . binding authority." Id. at 250 n.10.

This Court has carefully reviewed the LEOs cited by Plaintiffs and discusses them briefly below. Viewing them as a group, the LEOs seem generally to permit concurrent representation, provided there has been adequate consent, but they also are distinguishable in the ways pointed out by Deggeller. Ultimately, therefore, the Court concludes that none of them are directly on point. The Court nonetheless uses them as a starting point, both because the parties have devoted much of their briefing to discussing them and because they provide examples of situations where concurrent representation after disclosure and consent have been found permissible by the Virginia State Bar, despite the possible appearance of a conflict.

The first of these opinions, LEO 218,[10] involved representation arising from an automobile accident involving Car 1 and Car 2. According to the Committee's opinion, the same attorney who defended the driver of Car 1 against manslaughter charges arising from the

---
[10] Va. State Bar Standing Comm. on Legal Ethics, Informal Op. 218 (1972).

accident was also permitted to represent plaintiffs who were passengers in Car 1 against the estate of the deceased driver of Car 2, even though the estate had filed third-party motions for judgment against the driver of Car 1, so long as the plaintiffs consented after full disclosure. In so opining, the Committee found it "important" that the plaintiffs' previous testimony under oath in the manslaughter case exonerated the driver of Car 1. Deggeller correctly points out that LEO 218 does not appear to involve concurrent representation of the driver of Car 1 and the passenger plaintiffs. Thus, it is arguably distinguishable on this ground.

LEO 620 is scant on background details, but concluded that it would not be improper for an attorney to "represent three brothers in personal injury claims resulting from an automobile accident in which one of the brothers, who was driving, may have been at fault, when the three brothers have consented . . . after full disclosure . . . and when it is possible for the attorney to adequately represent the interest of each brother." Va. State Bar Standing Comm. on Legal Ethics, Informal Op. 620 (1984).

In LEO 1223,[11] the Committee cited to LEOs 218 and 620 as opining that "the multiple representation of driver and passenger is ethically permissible, even where client/driver may have been at fault, provided the attorney was convinced that he may adequately represent the interest of each and if each client consents to the representation after full and adequate disclosure." Applying that principle to the hypothetical presented in LEO 1223, the Committee opined that an attorney, having receiving consent after full disclosure, could concurrently represent Driver A and Passengers B & C as plaintiffs in a product liability action against persons in the chain of distribution of an allegedly faulty travel trailer that jack-knifed and injured A, B, and C. Notably, B and C had both informed the attorney that they knew of nothing

---
[11] Va. State Bar Standing Comm. on Legal Ethics, Informal Op. 1223 (1989).

that A could have done which would have caused the accident. The LEO also contained the following caveat: "The continued role of Attorney X must be re-evaluated, of course, should the situation change and one or both passengers indicate the desire to assert a claim against the driver or should the Vendor or others in the chain of commercial distribution assert a claim against driver." LEO 1223 at 2. According to Deggeller, the changed circumstances referenced in LEO 1223 are the precise facts of the instant case, since Deggeller has asserted a claim against Roseberry. Thus, the result in LEO 1223 would not govern the instant case. Instead, the instant case would require the "re-evaluat[ion]" referenced there. See id.

Finally, in LEO 379,[12] which was not cited by Plaintiffs, an attorney was employed to represent two different plaintiffs against the same defendant. Plaintiff A's vehicle was in an accident with defendant, and shortly thereafter, Plaintiff B's vehicle struck defendant's vehicle, which had remained on the highway after the accident with Plaintiff A. In Plaintiff B's lawsuit, the defendant filed a third party motion for judgment against Plaintiff A. The Committee opined that the attorney could continue to represent both A and B, despite the third-party claim, so long as both A and B consented after full disclosure. Deggeller argues that 379 is contradicted by the more fully-reasoned LEO 1223, as well as LEOs 620 and 210. ECF Nos. 41, 43, 33 at 3 n.1. It also contends that the accidents there were two separate car wrecks, or were "separate, but related" unlike the instant case, where there is a single accident at issue.[13]

---

[12] Va. State Bar Standing Comm. on Legal Ethics, Informal Op. 379 (1982).

[13] Another LEO cited by Plaintiffs, LEO 1354, does not inform the issue in the case at bar. See Va. State Bar Standing Comm. on Legal Ethics, Informal Op. 1354 (1990). There, the Committee opined that an attorney could not represent two passengers in a claim against the driver (who was also the mother of one of the passengers) absent consent from all three. The passengers and drivers had come together to the attorney to discuss the circumstances surrounding the accident, and the attorney learned that the driver had been cited for a failure to yield. The mother/driver refused to sign a written consent form and thus the Committee opined that continued representation of the passengers would be improper.

As stated, the Court has considered these LEOs, and finds that none of them are precisely on point, although taken as a group, they generally seem to support concurrent representation with full disclosure, even in the face of a third-party claim. Moreover, none of them expressly prohibit the representation here. Indeed, while Deggeller has done a noble job of pointing out the factors in those hypothetical situations that differ from the instant case, it has not pointed to any Virginia case or Virginia LEO that expressly forbids the representation here. In any event, rather than relying on the LEOs, the Court instead will utilize the applicable Rule of Professional Conduct, and apply it to the specific facts at issue here, while keeping in mind the general rules governing disqualification.

Rule 1.7 of the Virginia Rules of Professional Conduct prohibits representation of a client if it involves a "concurrent conflict of interest." Va. R. Prof. Conduct 1.7 (2010). A concurrent conflict of interest exists if

> (1) the representation of one client will be directly adverse to another client; or
> (2) there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

Id. If a concurrent conflict exists, a lawyer may continue the representation if: (1) each client gives written consent after consultation; (2) the lawyer reasonably believes he can provide competent and diligent representation to the clients; (3) the representation is lawful; and (4) "the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal." Id.

Here, Plaintiffs' counsel has obtained a written waiver of any possible conflict from all three Plaintiffs, and those waivers adequately and clearly inform Plaintiffs of the potential risks of the concurrent conflict. Moreover, the representation does not violate subsection (4) of Rule

1.7, since it does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation. Accordingly, this Court's inquiry focuses on subsections (1) and (3): (1) "whether the lawyer reasonably believes he can provide competent and diligent representation to the clients" and (3) whether the representation is otherwise lawful. In sum, if these two subsections are satisfied, then the potential or actual conflict is waivable, and Mr. Edwards' continued representation of all three plaintiffs is permissible. If, on the other hand, the conflict is non-waivable, as Deggeller argues, then the disqualification motion should be granted.

Subsection (1), by requiring that an attorney "reasonably" believes he can provide competent and diligent representation, necessarily includes an objective component. This is consistent, as well, with the notes to Rule 1.7, which state that "[W]hen a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent." Va. R. Prof. Conduct 1.7, Note [19]. See also Wright v. Kincheloe, 81 Va. Cir. 277, 2010 WL 7765584, *2 (Va. Cir. Ct. Oct. 20, 2010) (citing Dacotah Mktg. v. Versatility, Inc., 21 F. Supp. 2d 570, 582 (E.D. Va. 1998) (an attorney "may not represent a plaintiff and a third-party defendant with adverse interests unless it is 'obvious' that adequate multiple representation is possible"). Thus, this Court must determine whether the clients here should not agree to the representation.

In making this determination, however, the Court acknowledges the cautionary advice of the Fourth Circuit and other district courts that any disqualification must be based on a finding of an actual present conflict between the positions taken by the two clients and not on "conjecture" or the "mere possibility of a conflict." Richard Hilton Assocs. v. City of Richmond, 690 F.2d

1086, 1089 (4th Cir. 1982); Tessier v. Plastic Surgery Specialist, 731 F. Supp. 724 (E.D. Va. 1990) ("the disqualification of a party's chosen counsel is a serious matter which cannot be based on imagined scenarios of conflict") (citing Richard Hilton Assocs.). Moreover, "[t]he drastic nature of disqualification requires that courts avoid overly-mechanical adherence to disciplinary canons at the expense of litigants' rights freely to choose their counsel . . . ." Shaffer v. Farm Fresh, Inc., 966 F.2d 142, 146 (4th Cir. 1992). Thus, while in a close case, doubts are to be resolved in favor of disqualification, United States v. Clarkson, 567 F.2d 270, 273 n.3 (4th Cir. 1977), "some stronger objective indicator . . . than simple judicial intuition is needed to warrant the drastic step of disqualification of counsel." Shaffer, 966 F.2d at 145.

In this case, the Court concludes that the multiple representation of all three plaintiffs is permissible because, under the specific facts of this case, Plaintiffs' interests do not conflict. In particular, the Court finds significant the factual admissions made by the Plaintiffs in their affidavits, which likely bar any recovery against Roseberry, thus eliminating any potential conflict of interest. The bar is the result of the doctrine adopted by Virginia in Massie v. Firmstone, 114 S.E. 652, 656 (Va. 1922), which provides that "[n]o litigant can successfully ask a court or jury to believe that he has not told the truth." The so-called Massie doctrine applies only to "sworn statements of fact within a litigant's own personal knowledge and is based on the premise that a litigant should not be permitted to ask a court to make findings that contradict the litigant's own sworn statements regarding such facts." Beeton v. Beeton, 559 S.E.2d 663, 667 (Va. 2002) (citation omitted). Thus, assuming Massie applies to a pre-trial affidavit,[14] Simms and

---

[14] See, e.g., Worrell v. Worrell, 4 S.E.2d 343, 345 (Va. 1939) (assuming without deciding that the Massie rule applied to a plaintiff's pre-trial written statements, but concluding that the facts expressed therein did not implicate Massie because they were not facts within the plaintiff's knowledge, but opinions); Austin v. Jewell, 349 S.E.2d 113, 115 (Va. 1986) (same as to answers to interrogatories).

Goad would both be barred from recovering against Roseberry based on their own affidavits, since they clearly state that Roseberry's hat came off before the collision and landed on the ground. Even if the Court credited Simms' alleged statement to police instead, which was that the hat came off as a result of the collision, Roseberry's hat could not have contributed to the collision under either scenario. Thus, assuming <u>Massie</u> is applicable to their affidavits, neither plaintiff can rise above their own testimony to recover against Roseberry, even if they had directly asserted a claim against him, which they have not.[15]

Given these admitted facts by Plaintiffs, there is no scenario under which the parties' interests are adverse at this time, nor is it likely there will be a conflict even after a jury verdict. The possible jury verdicts in the case all bear this out. If the jury finds that neither Deggeller or Roseberry was negligent, Plaintiffs do not recover, but there is no conflict between Roseberry's interests and the other two Plaintiffs. If the jury finds that only Deggeller was negligent, then there is no conflict between the interests of the three Plaintiffs. If the jury finds that both

---

[15] At oral argument, Deggeller's counsel posited that the mere giving of the affidavits while jointly represented (which likely result in a <u>Massie</u> bar of any claim by Simms or Goad against Roseberry) is illustrative of the conflict inherent between the parties. But the Court notes that even the accounts allegedly given to the police from the hospital on the evening of the accident by both Simms and Goad (which, as to Simms, differs from their affidavits) indicated that Roseberry's hat played no role in the accident. Notably, there is no indication in the record that any of the plaintiffs had spoken with counsel at that time. Moreover, the fact that the three plaintiffs were represented by the same counsel at the time they executed their affidavits under oath does not alter the Court's analysis. The dissent in <u>Richmond Hilton Assoc. v. City of Richmond</u>, 690 F.2d 1086 (4th Cir. 1982) had similar concerns. There, a municipal board and individual board members were defendants in the same antitrust litigation, and the Fourth Circuit held it was permissible for the same law firm to represent all the defendants and thus reversed the district court's order of disqualification. In doing so, the majority relied heavily on the fact that the municipality (acting on the authority of a then-existing majority of the Council) had stated that it did not intend to contend that the actions of the individual defendants on which the suit is premised were *ultra vires*, but instead accepted responsibility for the actions of the violation alleged. Thus, there was no actual conflict. The dissent criticized that reliance because in making its decision not to allege *ultra vires* acts, the municipality was acting on the basis of advice given it by its potentially-conflicted attorney. 690 F.2d at 1090 (Russell, C.J., dissenting). The majority nonetheless found no actual conflict existed. <u>Id.</u> at 1088-90. Applying the same logic here, it is of no moment that the affidavits exonerating Roseberry (and

Deggeller and Roseberry were negligent, then Roseberry's contributory negligence would bar his own recovery, but Simms and Goad could nonetheless recover against Deggeller. If this third result came to pass, or if the jury found only Roseberry negligent, Simms and Goad would be unable to recover directly against Roseberry because of the admissions they have already made, pursuant to Massie.[16] Thus, the Court concludes there is no present actual conflict of interest, and no likelihood of such a conflict arising. At the very least, there is no conflict that cannot be consented to via waiver, as the Plaintiffs have done here.

For all of these reasons, the motions to disqualify, ECF Nos. 34, 36, 26, are DENIED.

## III. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that all of the motions pending before the Court are **DENIED.** An appropriate order will issue today.

ENTER: This 2nd day of January, 2013.

_____
James C. Turk
Senior United States District Judge

---

[16] The applicability of Massie may also have implications for Deggeller's third-party claim against Roseberry or for any claim for contribution, if the parties were to settle their claims. See, e.g., Pierce v. Martin, 334 S.E.2d 576 (Va. 1985) (applying Massie rule and concluding that the testimony of injured adult passengers, which was that the driver of the car in which they were riding did nothing wrong and that the driver of a truck that collided with the car was solely responsible for the accident, barred those passengers from suing the driver and likewise prevented the truck driver from recovering contribution from the car driver for amounts the truck driver paid to passengers to settle their claims).